First case is King Supply v. United States. Who's going first? Mr. Lowe, is that correct? Yes, Your Honor. Okay, thank you. It's never a good idea to try to divide arguments, but you may try. Please proceed. Good morning. My name is Jeffrey C. Lowe. I'm with the law firm of Mayor Brown, LLP. I'm here today with my colleagues, Simeon Kreisberg, on behalf of Whale Bend Corporation. And I will be doing our direct argument for ten minutes, and Mr. Bogart can do the rebuttal. In brief, this case turns on three critical points. First, this court reviews scope decisions by the Court of International Trade, de novo. And the court affords the Department of Commerce substantial deference to interpret the scope of its anti-dumping orders. Provided Commerce's interpretation in its scope ruling is reasonable and supported by substantial evidence, which it is in this case, it must be affirmed. Second, Commerce tends to avoid including in-use provisions in the scope of orders. Such provisions are difficult to administer and invite efforts by importers to evade the order's coverage. Commerce drafts these. Why don't we construe the drafting against the drafter, or if it has an ambiguity in it? Well, Your Honor, in particular with respect to the scope of these anti-dumping orders, Commerce is viewed as the expert. The court has recognized this in numerous decisions. Well, they shouldn't introduce an ambiguity into their drafting. If they're expert, they should know how to avoid that, right? Well, Your Honor, in an ideal world, there would be no ambiguity in these scopes or anywhere, but sometimes that does happen. And arguably, there is some ambiguity in this scope. But as I was saying, number three, the third critical point, when Commerce does intend to include an in-use provision, it does so expressly using terms such as solely or only to describe the uses subject to the order. The scope in this case does not contain the type of express in-use provision consistently used by Commerce when it seeks to include or exclude certain products on the basis of use. Very briefly, the first sentence of the scope reads in its entirety, The products covered by this order are carbon steel butt-weld pipe fittings having an inside diameter of less than 14 inches, imported in either finished or unfinished form. In its scope ruling, Commerce reasonably interpreted this physical description of the merchandise subject to the order as including all butt-weld pipe fittings meeting the description. It is undisputed, as Commerce found and as King has conceded, that King's imported pipe fittings match this physical description exactly. Therefore, Commerce determined that King's fittings are included within the scope. What's the difference between the two products, if any, physically? Your Honor, King's imported pipe fittings are exactly the same as the pipe fittings that were intended to be covered by the scope of this order. So when you say two products, any butt-weld pipe fitting less than 14 inches in diameter, finished in either finished or unfinished form, imported into the United States from China, is subject to this order by that physical description, including those that are imported by King, which are exactly meeting that description. Are they entered under the same HTS number? Yes, Your Honor. There's no difference in the HTS number at all? There's no difference whatsoever. In fact, as Commerce found in its scope ruling, King's pipe fittings meet the ANSI and the ASTM industry standards, which this Court has found in at least one case is a viable consideration for determining whether a product matches a physical description. So as I was saying, in rejecting Commerce's interpretation, the CIT never examined the physical description of the covered merchandise in the first sentence of the scope. Rather, the CIT focused almost entirely on a single eight-word phrase in the second sentence of the scope, that pipe fittings, quote, are used to join sections in piping systems, end quote. According to the CIT, this phrase, quote, describes the use, one and only use, of the pipe fitting subject to the scope of the investigation. As so described, it amounts to an exclusive use, end quote. What the CIT failed to acknowledge, however, is that the phrase, are used in piping systems, is subject to interpretation. Did you include this language in the petition? Is this language included in the petition, the Duncan petition that describes the product under investigation? Well, yes, Your Honor. In the petition, there was a separate paragraph that set out the physical description, which I read at the first, at the outset. And then later on, the petition went on to describe various aspects of the covered merchandise, and language to that effect was included there. But then Commerce wrapped it into a single paragraph in order to do the purpose of the second sentence that I'll get to in a minute. Judge Musgrave noted that the used in piping systems language would be surplusage under your interpretation. Well, Your Honor, it isn't. It would have no application or meaning at all. Right. It isn't my interpretation. It's the Commerce Department's interpretation in its scope ruling. And the Commerce Department actually imputed meaning to the entire scope here. As I said, there's two sentences, approximately 100 words. The first sentence sets out the physical description in which Keene's pipe fins are covered. It's the surplusage. Yes, sir. Well, and then the second sentence, Commerce found that it does two things. One, it establishes a possible end use, which is a reasonable interpretation of that phrase. And two, it distinguishes butt welding as a type of fastening method from other types of fastening methods, which the scope identifies as threaded, bolted, or grooved. But the used in piping systems language is surplusage. No, Your Honor, it's not. That statement establishes the used in piping systems as one type of use, a possible use, as Commerce said. But you didn't mention that it could be used in structural applications or as handrails on stairs or whatever else, right? No, Your Honor. Commerce didn't. However, the U.S. – The language is surplusage. The only thing you're really interested in is the butt welding point. Well, the fact that piping systems requires a permanent connection, which is what butt welding provides, that's what Commerce was getting to. And it's important to note that the U.S. International Trade Commission, in its final determination, specifically stated that structural uses also require butt welding. And it's important, too, that King, when it imported the butt weld pipe fittings, recognized that they needed to have a butt welding, a permanent connection of that type. Otherwise, they would have imported – one imagines that it avoided the scope ruling altogether. They would have imported threaded, grooved, or bolted fittings. In its scope ruling, Commerce did not interpret the phrase as establishing an exclusive use or in-use provision. Rather, Commerce found that the second sentence of the scope, as I say, identified a possible in-use of butt weld pipe fittings and distinguishes them from other types of – What are other uses of the pipe fittings? Other uses of butt weld pipe fittings? Yes, other than in piping systems. Well, again, structural uses includes anything such as, if you think about it, scaffolding for when you're to do repairs or to construct a building. The construction people erect scaffolding, and these types of fittings are used in that context, too. And, in fact, Commerce tends to avoid excluding products from the scope of an order on the basis of in-use because such exclusions are difficult to administer and increase the likelihood of evasion. In the limited instances in which it does seek to do that, Commerce's consistent practice, as it is recognized, is to make that exclusion as clear as possible using terms such as solely or only. Most notably, as we discussed in our brief, this court's decision in extreme involved an order that contained an express in-use provision. To begin, while the first part of the extreme scope is very similar to the scope in this case, the scope in extreme explicitly stated that it applied only to certain stainless steel pipe fittings. This court cited inclusion of the term certain in extreme as intended to limit the coverage of that scope. By contrast, the scope here does not contain the word certain. By its term, this order applies to all Butwell pipe fittings meeting the physical description, not just to, quote, certain pipe fittings. Is there evidence in the record that sales of the pipe fittings that your client produces are made to these structural industry, to the construction industry? I'm sorry, Your Honor. Is there evidence in the record that sales by King are actually made to the structural industry? Well, Your Honor, actually there's evidence in the record to the effect that King says that its products are used in a structural context. But there's no evidence that I'm aware of, and I would defer to others for this. But as far as I recall, there's no evidence that they're actually sold for the use in structural uses. In X, what is the policy underlying the proposition that commerce can interpret but not change a scope order? Who's being protected by the prohibition on commerce's changing a scope order? Well, Your Honor, I note that my 10 minutes is up, but I'm more than happy to – Yeah, I'd like to hear the question. Well, both the foreign – the producers and the importers are being protected by that, and the domestic industry, because once an order is put in place, it would violate the principle of being able to rely on – Well, that's really where my question was going. Is there detrimental reliance in a situation such as this? In other words, and where this leads, of course, is could someone who looked at this order and concluded that this order was limited to pipe use, would that person be detrimentally relying for their prejudice on that reading of the order? Well, Your Honor, in the first place, this order was issued in 1992, and nobody had ever brought commerce a scope ruling request of this nature. So as far as anybody knows – and what happened here was King began importing these products. Customs immediately interpreted the order as saying, this product is covered. It meets the physical description. And so King didn't have any kind of pre-forewarning that they wouldn't be subject to the order. But otherwise, no, there has to be some interpretation. And as this court has recognized in numerous decisions, commerce is the agency that does that when it comes – when somebody has a question such as King. So there's a certain amount of ambiguity in this eight-word phrase. It could be interpreted as a mandate, which the CIT did, but it could also be interpreted as an example of a possible use, which is what commerce did. In the context of the entire scope, the physical description, which unlike an extreme, does not allow for any exception, and the rest of the sentence, which commerce, like I said, gave meaning to as a possible end use and as distinguishing this type of fasting method from other types. Commerce's determination, its interpretation here was reasonable. So there was no – as far as – You want to save a little of Mr. Bogart's time? Yes, sir. Yes, Your Honor. That's all I have then. Thank you very much. Thank you, Mr. Vakarix. Yes, thank you, Your Honor. It's actually Vakarix, but I hear Vakarix a lot. I'm sorry, Vakarix. You should read my mail when it comes in. Thank you very much for the chance to be here. I'm Tom Vakarix. I'm with Barnes-Richardson and Colburn. Steve Brophy is with me today. Steve, of course, is also with Barnes-Richardson. Now, what would prevent your client, Mr. Vakarix, from suggesting that they are bringing their pipes, their imports in for use as structural members in a scaffold and then later convert them into a natural gas pipe? The well-established business practice the company has followed for a large number of years. The company, if you look at some of the background information we put in, it deals in architectural elements, architectural structures. It does not cater to the oil industry or to the piping system industry. But you import too many and you need to get rid of your excess inventory, and so could you sell them to a natural gas company for use in their pipe fittings? Very unlikely. What would prevent that? Well, one main reason is King does not request certifications from the mill that the pipe fittings meet ASTM or ANSI standards. Anybody who wants to use a pipe fitting in a piping system has to have that certification. So occasionally, King tells us they may receive one of those certifications or a mill certificate. They don't ask for them, they don't file them, they don't keep them. So it would be pretty difficult for them to pass it off to an engineer for use in piping systems because they don't have these certifications. They don't need them for structural applications. Certifications are required even for low-grade uses such as, let's say, in a lawn sprinkling system? Well, a piping system is under high pressure. I'm not sure about a lawn sprinkler system. Well, it depends, I guess, on how much pressure you put them under. That's correct, Your Honor. You could have a lawn sprinkler other than the usual hose. You could have one that's set up with permanent piping and a large lawn. I imagine, but that would not fall within the definition of a piping system as I understand it. The record's quite clear that the industry has... to exclude uses as a pipe for a lawn sprinkler? You know, it's never come up. I understand, but that seems to me to be an even narrower definition of what's covered under the scope. The way I understand it and the research we've done and the exhibits we've put in on the record show pretty sophisticated industrial systems hooked up with pipe fittings. And I've never seen anything about a lawn sprinkler system. Commerce didn't find that these met the specs, though, did they? Oh, absolutely. We admitted that. When we filed our application, we said the physical characteristics of our pipe fittings are identical to the subject merchandise. Were your pipe fittings imported saying that they met those specs? Or met certain industry specifications? No, not necessarily. Occasionally a manufacturer will include these certifications. King does not request certifications, and King does not maintain files on certifications. And we fully conceded in response to a questionnaire that we went back to the manufacturers. King didn't know. We had to go back to the manufacturers. They came back to King and said, yes, we manufacture all our pipe fittings to meet ASTM ANSI standards. That's never been an issue. And it goes to one point raised by Mr. Lowe, the suggestion that the court somehow never looked at the definition, the physical characteristics of subject merchandise versus the structural use merchandise. There's no evidence in the record that the court did not examine that, no evidence at all. Secondly, the fact that it was not an issue makes that a far less, we submit, important factor for the court to consider. It just was never an issue. The key issue was you have the same product. The reason it's not covered is because of an end-use restriction. Isn't there evidence in the record that King's products meet the same industry standards as a product produced by the domestic parties? And I'm talking about the ASTM standards. Yes, sir. And that they were referenced in the petition. Yes, sir. And do you rebut that? No, sir, that's true. So there's no, the physical characteristics of the two products are the same. They both meet the same industry standards. So wouldn't you say that they're fungible? They would be fungible. So they're interchangeable. They would be interchangeable. So if you're allowed to not fall within the scope of the order, wouldn't it be pretty easy just to circumvent the anti-dumping order altogether? Well, with all due respect, Your Honor, circumvention has no place in the scope proceeding. The law is well established. The commerce policy is well established. They tell, don't argue circumvention in a scope ruling. Commerce has a separate position. Okay, let's say escape. Escape? Yes. I mean, you've got the same product. They're interchangeable. I can go buy your product or I can go buy the other product and use them any way I want. You're not going to buy our product because we don't have the mill certificates. They have to accompany the sale of the product. We cannot prove that they meet specs. Okay? So we can't sell it. If we sold it, the engineers wouldn't pass it. They wouldn't take it. I could go buy your product and the other product and use them in my sprinkler system or in a handrail or in a pipe fitting. You'd get in trouble. You would get in trouble. The inspector comes by and he asks for the mill certificates, the ASTM. For my sprinkler? Well, I know we're talking about sprinkler systems. For the sake of argument, I say, yeah, you've got to have this certified. I think sprinkler systems are all plastic pipes. It's a different animal. But you're saying that none of your products are certified. That's correct. How are they sold then? If I can't use it in my sprinkler system because they're not certified, then how are they sold in the U.S. and how are they being used? They're sold for architectural structural applications. Handrails, guardrails, items like that. And your inspector, the guidance you've given us, and the inspector wouldn't let me use it in a sprinkler system, but you can use them in a handrail, in a structure? Would not let you use it in a piping system. That's right. You couldn't. You'd violate the code. Okay? You have to have that certificate. Now, on a general point, you have identical physical characteristics. By definition, anytime commerce, and they've used it many, many times, anytime commerce uses an end-use restriction, the physical characteristics of the subject and non-subject merchandise are identical. There's no other reason to use the end-use. You say we have the same identical physical characteristics, but this order covers only this application. I mean, on that point, and that's what I was actually going to ask you next, so you turn to it. I've looked at a number of examples of end-use restrictions that commerce has inserted into these orders, and I have not been able to find any that are as, well, for lack of a better term, ambiguous as this one. They all seem to be pretty explicit in saying that this order applies only to imported goods that are used for the following purpose, or this order accepts goods that are used for the following purpose. Do you have any examples of end-use restrictions that were considered, either adjudicated to be or considered by commerce to be end-use restrictions, which have the kind of language that this has, in which there is not an explicit statement that the end-use is excluded? Yeah, if you look at Allegheny-Bradford, which we do cite in our brief, and you go to the last page, the court says, quote, ask for the order's failure to exclude non-beveled fittings explicitly. Duferco, which is a Federal Circuit case, extinguished the theory that a product would be covered by an order merely because the order does not explicitly exclude it. So to the extent there's law on that point, the law is in our favor. The law says you can still have an end-use restriction, but the order does not have to say pipe fittings used in structural applications are excluded from this order. It can be done by the language, the pipe fittings are used to connect segments in piping systems. So the law is there and the law is on our side. Can I reserve a couple of minutes for... There's no cross-appeal. Okay. There's nothing you need to reserve. All right, thank you, Your Honor. Let me ask further about this. Please. Was this Allegheny-Bradford case... That's a CIT case, right? That's a CIT case. And was that an end-use restriction case? That was an end-use restriction case. All right. As we... Steve, if I write on that... It was a situation where a certain product was excluded. Yeah, that's a lot of cases, but an end-use is a very particular subset of those cases. It's one thing to say that a good is not within the scope of the order if it is not explicitly made subject to the order. That's a general, broad proposition. Fine. But if we're talking about end-uses, my question to you was, is there an end-use case or a case in which Commerce has approved or blessed the notion that something is an end-use with language that is as ambiguous as this language? Your Honor, I will have to say with Allegheny-Bradford, I cannot cite to you another case at this time. Well, we'll see whether your opposing counsel sees Allegheny-Bradford the same way you do. I'm sure he doesn't. Well, I know he does if you're both reading it accurately. If I may continue... Or wrongly. I'd like to note, I still have some time, I believe. I'd like to note Commerce isn't here. Commerce never filed briefs in this appeal. Commerce is gone. They're history. I think that the only way you can interpret that is Commerce made a decision, that they're willing to live with that court of international trade decision, and they're willing to live with their remand order that the structural use application takes these by-fittings outside the scope of the order. I'd also like to note, I think it's unfortunate that in reaching to try to win this thing, it's pretty fair on its face, we submit. You read the order, it's not using piping systems, it's not covered. To suggest that the court of international trade below somehow acted contrary to law by substituting its judgment for that of the Commerce Department is, we think, specious and uncalled for. Isn't the standard of review of the CIT of Commerce decisions one of substantial evidence and deference? Exactly. Exactly. What the judge below said, there's no substantial evidence to support the decision that the use for structural applications fall within the scope. That is what the judge is required to do. Is there substantial evidence? Is there not? Once the lower court decided there was no substantial evidence, the lower court had no choice but to issue the decision they did, which was a remand. The record shows there are only two uses for these carbon-sealed butt-well pipe fittings, either piping systems or structural applications. There's no in-between. In a dumping case or a scope review, wouldn't the fact that the products have the same physical description, the very same physical description, isn't that substantial evidence? No. Their argument is physical description controls, physical characteristics control. Our argument is they're trumped by an end-use restriction. And you go through all these end-use cases, you'll see the products that are restricted. You just told us that the products are fungible. They're fungible if you have a certificate and you want to put them into a piping system and you have a mill certificate. A customer could do that. Okay? But the way commerce operates under this system is they take the position that these products coming in are used in structural applications. To the extent they have a policy, the policy is if you think they're being used in piping systems, prove it. Come to me, commerce, with evidence demonstrating that these structural application pipe fittings are being used in piping systems, and we'll take action. How about the other way around? Can't the products that were investigated, can't they be used in a, let's say, handrail?  Yes, they can, Your Honor. But fungibility is something that exists in every end-use case. Or you wouldn't have a need for an end-use restriction. So the fact that fungibility may exist does not by definition mean the product's covered. Commerce said, yeah, carbon steel buttwell pipe fitting used to join sections in piping systems. Commerce was very much aware of structural applications at the time that order was drafted. They may regret the language. They may have wished they had put in structural applications, but they didn't. And commerce can't come back now, as the court is well aware, and change it. Is it the case, as your opposing counsel suggested, I think, I may have misunderstood exactly the point he was making, that commerce has been interpreting this order not to be limited to piping systems since 1992? There's been no ruling since 1992. No ruling, but they've been applying it to systems. Contrary to suggestions. Did I hear the suggestion correctly, or am I making this up? That's incorrect. There's nothing in the record to support that conclusion. Our client, my client, has been bringing this in for years. And suddenly, one day, customs said, uh-oh, we think this is covered. The client said, no, it's not. So you've been bringing it in, and it hasn't been treated as being covered. That's right. For quite a while. And then they were surprised that one entry, customs said it's covered. They said, no, it's not. I see. That's what led to this case. Thank you, Mr. Vakarix. Mr. Bogart, you have a little less than three minutes. Good morning. For the record, I'm Lawrence Bogart from the law firm of Neville Peterson. I will attempt to hit, I think, three or four points in my two minutes. First, to address Judge Rader's question about whether the Commerce Department's interpretation of the order renders the used-in-piping-system phrase mere surplusage, we don't agree with Judge Musgrave's conclusion in that regard. And the reason would be that the language is a broad statement of fact. It's a generalized statement of fact. But if you didn't mean it as a use limitation, you could have said in pipe fittings or structural applications. And if we had intended it to be a limitation by end use, we would have said only used-in-piping-systems. Why didn't you say or structural limitation? Because as a general statement of fact, it wasn't necessary to add that. Well, but you knew that it was coming in in other forms for other purposes. We knew there were other general applications, but that doesn't mean that pipe fittings are not used-in-piping-systems. There's no limitation in that language. The lower court read that limitation into the language, and King would read that limitation into the language. Mr. Vakarick says that the product that King brings in can't be sold for use-in-piping-systems, although it, in fact, is manufactured for use-in-piping-systems because his client does not ask for the mill certifications or certification for ANSI and ASTM standards. And there's two answers to that. One, there is nothing that stops an end user who's buying his client's product for use-in-a-piping-system from obtaining those certifications directly from the mill through email or DHL or whatever. Secondly, it's also the practice among a number of industries that buy pipe fittings for use-in-piping-systems to go ahead on their own and test those pipe fittings to ensure that they meet ANSI and ASTM standards. And since King's products wouldn't meet those standards, they would meet those, they would pass those tests. In response to Judge Bryson's question, we fundamentally disagree with Mr. Vakarick's characterization of Allegheny-Bradford. That case involved physically different merchandise. I believe it was a beveled product versus an unbeveled product. It's not an end-use case? It's not an end-use case. It's a physical difference case. All right. We'll see. As Judge Rayner has pointed out in his discussion with Mr. Vakarick, the products that King brings in are physically identical in every respect to butt-weld fittings subject to this order, and they are certified for use-in-piping- systems. They're manufactured with that purpose. Essentially, my time is up. If there are no questions from the Court, that concludes my argument. Well, let me ask one question. I suppose you could have a situation. I don't know if this is that, but you could have a situation in which a particular product at the time that the order was first issued was only being used for a single purpose. Something like a compact disc, which at the time in the history of compact discs that the order was entered, it was only being used for playing music. And the scope order could say compact discs and describe them perfectly and said these compact discs are used to play music. And I suppose your argument would be that if the compact discs, which are exactly described in the order, are later used for other purposes in some instances, to load programs onto computers and the like, that the fact that there was a description of the use, even without the word normally or predominantly or whatever, would not limit the description of the compact disc. That would be our argument, Your Honor. And I think what supports that argument is if one goes back and looks at the petition itself, the language that the CIT and Mr. Vakriks contends is an end use limitation appeared in a separate paragraph from the actual scope language as contained in the petition, which was simply a physical description of the petition. So lack of adverting to, or lack of knowledge of, or lack of awareness of other uses doesn't convert a characterization of use into an end use restriction. Correct, Your Honor. I understand. Were you aware that King was importing and not paying dumping duties? No, we were not. I found that to be an interesting assertion. All right, thank you. Thank you very much.